# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

March 11, 2019

Mr. Tony R. Moore
Western District of Louisiana, Shreveport
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

No. 17-30486    USA v. Michael Lord, et al
USDC No. 5:15-CR-240-1
USDC No. 5:15-CR-240-2

Dear Mr. Moore,

Enclosed is copies of the judgments, as to each appellant,  issued
as the mandate and a copy of the court's opinion.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Shea E. Pertuit, Deputy Clerk
504-310-7666

cc w/encl:
    Mr. Paul J. Carmouche
    Ms. Camille Ann Domingue
    Ms. Carol Mignonne Griffing
    Mr. Joshua K. Handell

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

No. 17-30486

_____

D.C. Docket No. 5:15-CR-240

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

        Plaintiff - Appellee

v.

MICHAEL A. LORD,

        Defendant - Appellant

Appeal from the United States District Court for the
Western District of Louisiana

Before STEWART, Chief Judge, and DENNIS and WILLETT, Circuit Judges.

## J U D G M E N T

    This cause was considered on the record on appeal and was argued by counsel.

    It is ordered and adjudged that the judgment of the District Court is affirmed in part and reversed in part, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.



Certified as a true copy and issued
as the mandate on **Mar 11, 2019**

Attest: *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

No. 17-30486

---

D.C. Docket No. 5:15-CR-240

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

MICHAEL A. LORD; RANDALL B. LORD,

      Defendants - Appellants

Appeal from the United States District Court for the
Western District of Louisiana

Before STEWART, Chief Judge, and DENNIS and WILLETT, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.



**Certified as a true copy and issued
as the mandate on Mar 11, 2019**

**Attest:** *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30486

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

MICHAEL A. LORD; RANDALL B. LORD,

      Defendants - Appellants

Appeal from the United States District Court
for the Western District of Louisiana

Before STEWART, Chief Judge, and DENNIS and WILLETT, Circuit Judges.

CARL E. STEWART, Chief Judge:

Michael A. Lord and his father, Randall B. Lord, (collectively, "the Lords") pleaded guilty, pursuant to written agreements, to conspiracy to operate an unlicensed money servicing business ("MSB") (Count One). Michael also pleaded guilty to conspiracy to distribute and possess Alprazolam, a Schedule IV controlled substance, with the intent to distribute (Count Fifteen). After entering into their guilty pleas, the Lords filed a joint motion to withdraw their guilty pleas. They stated that after they entered their guilty pleas, they

No. 17-30486

learned from other bitcoin[1] dealers and from the State of Louisiana Office of Financial Institutions ("OFI") that they did not need an MSB license. The district court denied the Lords' motion to withdraw their guilty pleas as to Count One. The court found that the Lords' motion contained no argument relative to Michael's plea to Count Fifteen and that, in any event, he was not entitled to withdraw his plea. The Lords appeal the district court's denial of their motion to withdraw their guilty pleas, as well as their sentences. For the reasons below, we AFFIRM the district court's judgment as to Michael Lord and Randall Lord, with the exception that we REVERSE and REMAND for resentencing as to Michael Lord's maintaining a premises for the purpose of manufacturing or distributing a controlled substance enhancement and special skills enhancement.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Lords were charged in a single indictment with 14 counts relating to their bitcoin business. Michael was charged with one count for a drug offense. The Lords pleaded guilty, pursuant to written agreements, to conspiracy to operate an MSB (Count One). Michael also pleaded guilty to conspiracy to distribute and possess Alprazolam, a Schedule IV controlled substance, with the intent to distribute (Count Fifteen).

MSBs are subject to 18 U.S.C. § 1960, which criminalizes the failure to obtain a state license, when required, and to comply with federal registration requirements. The statute provides that an MSB is unlicensed if it:

> (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew

---

[1] Bitcoin is a decentralized form of electronic or digital currency that exists only on the Internet.

No. 17-30486

that the operation was required to be licensed or that the operation was so punishable;

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

(C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

18 U.S.C. § 1960. Other regulations require MSBs to register with the Financial Crimes Enforcement Network ("FinCEN") within 180 days of the date the business is established. 31 C.F.R. § 1022.380(b)(3).

The indictment charged that the Lords, as part of their conspiracy, began operating a bitcoin exchange business in 2013; the Lords and their companies did not obtain licenses to engage in the business of money transmission by the State of Louisiana; between 2013 and November 10, 2014, they did not register with the United States Treasury Department; and they did not register as an MSB with FinCEN until November 2014, by which time they had exchanged approximately $2.6 million for bitcoin.

The Lords entered their guilty pleas on April 19, 2016. The initial presentence reports ("PSRs") were prepared on June 16, 2016. The Lords filed objections to their PSRs in July 2016, asserting, inter alia, that they believed that they were not required to obtain a Louisiana license. In support, they attached a February 17, 2016 letter from the OFI stating the same to an applicant whose business involved "cryptocurrency." On August 29, 2016, the Lords filed a joint sentencing memorandum arguing that their guilty pleas were not knowing because the law surrounding bitcoin was confusing and had stymied their efforts to comply with the law. On February 21, 2017, the Lords filed a joint motion to withdraw their guilty pleas. The Government opposed the motion, conceding that the State of Louisiana does not require virtual

No. 17-30486

currency exchangers to have a state license, but arguing that they could be convicted on the alternative basis that they had failed to register timely with FinCEN.

The district court denied the Lords' motion to withdraw their guilty pleas. The district court sentenced Randall below the guidelines range to 46 months of imprisonment and three years of supervised release. It sentenced Michael within the guidelines range to 46 months on Count One, 60 consecutive months on Count Fifteen, and three years of supervised release.

## II.     DISCUSSION

### A. Withdrawal of Guilty Pleas

#### 1. Standard of Review

A district court's denial of a motion to withdraw a guilty plea is reviewed for abuse of discretion. *United States v. Powell*, 354 F.3d 362, 370 (5th Cir. 2003). "[A] district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *Id.* (quotation omitted) (brackets in original).

#### 2. Applicable Law

A defendant does not have an absolute right to withdraw his guilty plea. *Id.* (citation omitted). Instead, the district court may, in its discretion, permit withdrawal before sentencing if the defendant can show a "fair and just reason." *Id.* at 370. The burden of establishing a "fair and just reason" for withdrawing a guilty plea remains at all times with the defendant. *United States v. Still*, 102 F.3d 118, 124 (5th Cir. 1996).

In considering whether to permit withdrawal of a plea, the district court should address the seven factors set forth in this court's opinion in *United States v. Carr*, 740 F.2d 339, 343–44 (5th Cir. 1984). These include: (1) whether the defendant asserted his actual innocence; (2) whether withdrawal would prejudice the Government; (3) the extent of the delay, if any, in filing the

No. 17-30486

motion to withdraw; (4) whether withdrawal would substantially inconvenience the court; (5) whether the defendant had the benefit of close assistance of counsel; (6) whether the guilty plea was knowing and voluntary; and (7) the extent to which withdrawal would waste judicial resources. *Id.* "[N]o single factor or combination of factors mandates a particular result," and "the district court should make its determination based on the totality of the circumstances." *Still*, 102 F.3d at 124. The district court is not required to make explicit findings as to each of the *Carr* factors. *Powell*, 354 F.3d at 370.

### 3. Analysis

#### a. Assertion of Innocence

The Lords argue they asserted their innocence by stating that while they were operating their bitcoin business, they believed that they did not have to obtain a Louisiana license. They acknowledge that § 1960 allows the Government to convict if an MSB fails to register but argue that they registered with FinCEN in November 2014 and "have defenses available to them with respect to this element."

The district court found that the Lords did not assert their actual innocence. The court reasoned that the failure to obtain a state license was but one theory on which Count One was based and that the evidence presented at the Lords' re-arraignment was sufficient to prove that they were an MSB and that they failed to register timely with FinCEN.

The Lords' arguments do not go to their factual innocence; rather, they amount to an assertion of their legal innocence based on perceived potential defenses to the offense. In *Carr*, the defendant argued his legal innocence, asserting that he was entitled to withdraw his guilty plea because trial counsel failed to inform him that he could use an "advice of counsel" defense to the conspiracy charge he faced. 740 F.2d at 343. The court found that, although the defendant had asserted his innocence, "this claim alone is far from being

No. 17-30486

sufficient to overturn denial of a withdrawal motion. Otherwise, the mere assertion of legal innocence would always be a sufficient condition for withdrawal, and withdrawal would effectively be an automatic right." *Id.* at 344. Likewise, the Lords' proffered legal innocence, realized after their pleas, is not grounds to withdraw their pleas. *See id.*; *United States v. McKnight*, 570 F.3d 641, 649 (5th Cir. 2009) (finding that an assertion of innocence was not supported by claims of "legal innocence based on insanity and entrapment"); *United States v. Meza-Jacquez*, 671 F. App'x 340, 341 (5th Cir. 2016) (per curiam) (unpublished) (finding no abuse of discretion where innocence claim was based on "a 'colorable defense' to the charged offense").

### b. Prejudice to the Government

The Lords argue that "it is difficult to understand" how the Government would be prejudiced by their plea withdrawal because the Government is required to prove the indictment's allegations in every trial. The district court found that the Government would suffer "some" prejudice if the Lords' motion were granted because it would require the Government to prove the indictment allegations at trial. Regardless of whether the Government would suffer prejudice, "*Carr* made clear that the absence of prejudice to the Government does not necessarily justify reversing the district court's decision to deny a motion to withdraw a guilty plea." *McKnight*, 570 F.3d at 649 (citing *Carr*, 740 F.2d at 344).

### c. Delay

The Lords maintain that "there were significant discussions" before they filed their motion to withdraw "to examine the options available" to them and that the delay was "appropriate." The district court found that the Lords were aware in August 2016 that Louisiana does not require a license for operating a bitcoin exchange business but delayed filing their motion to withdraw their pleas for six months.

6

No. 17-30486

"[T]he longer a defendant delays in filing a withdrawal motion, the more substantial reasons he must proffer in support of his motion." *Carr*, 740 F.2d at 344. The Lords' assertion that the delay was "appropriate" is non-specific and conclusory. Moreover, the record supports the district court's finding that the Lords waited almost six months from learning they did not need a license to file the motion to withdraw. Much shorter delays have been deemed unacceptable. *See, e.g., United States v. Thomas*, 13 F.3d 151, 153 (5th Cir. 1994) (describing a six-week delay as "significant"); *United States v. Rinard*, 956 F.2d 85, 88–89 (5th Cir. 1992) (holding that a 69-day delay weighed against defendant); *United States v. Hurtado*, 846 F.2d 995, 997 (5th Cir. 1988) (holding that a seven-week delay weighed against withdrawal); *Carr,* 740 F.2d at 345 (finding that the motion "was not promptly filed" 22 days after the plea).

### d. Inconvenience to the Court

The Lords rely on the court's statement that withdrawal would not substantially inconvenience the court. The district court also stated, however, that withdrawal would require the court to hold a multi-day trial on 15 separate counts. When, as here, the district court has already reviewed the PSR and other materials, a motion to withdraw is disruptive to the trial docket and inconveniences the court. *See, e.g., United States v. Grant*, 117 F.3d 788, 790 (5th Cir. 1997); *see also United States v. Adams*, 275 F. App'x 298, 300 (5th Cir. 2008) (per curiam) (unpublished).

### e. Close Assistance of Counsel

The Lords deem whether they had close assistance of counsel "irrelevant" in their case "because no legal authority could be obtained by counsel prior to the guilty hearing to support the Lords['] defense." The district court found that the close assistance of counsel was available to the Lords throughout the proceeding.

No. 17-30486

The Lords' treatment of this *Carr* factor is more theoretical than it is probative—whether a defendant had close assistance of counsel does not turn on whether counsel found legal authority to support a viable defense. In weighing this factor, we look to whether counsel was available to the defendant throughout the proceedings, *see, e.g.*, *United States v. Benavides*, 793 F.2d 612, 617–18 (5th Cir. 1986), including whether counsel negotiated the defendant's plea agreement, *McKnight*, 570 F.3d at 646–47, and whether a defendant was satisfied with his defense counsel, *United States v. Herrod*, 595 F. App'x 402, 411 (5th Cir. 2015) (unpublished). Whether a defendant received close assistance of counsel is "a fact-intensive inquiry." *United States v. Urias-Marrufo*, 744 F.3d 361, 365 (5th Cir. 2014) (quotation omitted).

The Lords received the quintessential type of assistance that this factor contemplates. They were represented by retained counsel throughout the proceedings, including their initial appearance, their plea agreements, and at re-arraignment. At re-arraignment, they confirmed that they were satisfied with counsel's representation. As such, the Lords had the benefit of close assistance of counsel.

### f. Knowing and Voluntary Nature of the Pleas

The Lords assert that it was "impossible" for them to have made a knowing plea because at the time of the plea, all parties and the district court believed that Louisiana required money transmitters to obtain a license.

Because a guilty plea involves the waiver of constitutional rights, it must be voluntary, knowing, and intelligent. *Brady v. United States*, 397 U.S. 742, 748 (1970). To enter a knowing and voluntary guilty plea, a defendant must have full knowledge of what the plea connoted and of its consequences. *Boykin v. Alabama*, 395 U.S. 238, 244 (1969). "A guilty plea is invalid if the defendant does not understand the nature of the constitutional protection that he is waiving or if he has such an incomplete understanding of the charges against

No. 17-30486

him that his plea cannot stand as an admission of guilt." *James v. Cain*, 56 F.3d 662, 666 (5th Cir. 1995) (citation omitted).

In addition, the district court must "determine that the factual conduct to which the defendant admits is sufficient as a matter of law to constitute a violation of the statute." *United States v. Marek*, 238 F.3d 310, 314 (5th Cir. 2001) (en banc) (emphasis omitted). The district court must compare "(1) the conduct to which the defendant admits with (2) the elements of the offense charged in the indictment or information" to ensure that the defendant understands not only the nature of the charge but also that his conduct falls within the charge. *Id.* at 315; *see also United States v. Castro-Trevino*, 464 F.3d 536, 540 (5th Cir. 2006) ("The factual basis for the guilty plea must appear in the record . . . and must be sufficiently specific to allow the court to determine that the defendant's conduct was within the ambit of that defined as criminal." (quotation omitted) (alteration in original)). The underlying purpose of the rule "is to protect a defendant who may plead with an understanding of the nature of the charge, but without realizing that his conduct does not actually fall within the definition of the crime charged." *United States v. Reasor*, 418 F.3d 466, 470 (5th Cir. 2005) (quotation omitted).

The district court found that the Lords' guilty pleas were knowing and voluntary based on the colloquy at re-arraignment. The indictment against the Lords charged both means of violating the statute. While the Government could not prove a § 1960 violation by relying on a state licensing requirement, the evidence supporting the guilty plea established the Lords' guilt under the second method, a premise they do not dispute on appeal. At the guilty plea hearing, an IRS agent testified that a regulation issued in March of 2013 required bitcoin exchangers to register with FinCEN. The agent further testified that the Lords did not register with FinCEN until November of 2014, by which time they had already exchanged $2.6 million dollars for bitcoins.

No. 17-30486

After the witness testified, the court asked both Randall and Michael if either had "any substantial disagreement with [that testimony]." Both stated they did not. Given that § 1960 is disjunctive, the Lords' admissions with respect to FinCEN registration were sufficient for the district court to determine that they knowingly and voluntarily entered their pleas.

### g. Waste of Judicial Resources

The Lords admit that some time may be considered wasted, but that such waste cannot be avoided when the Government's allegations in the complaint are based on an incorrect knowledge of the law. They add that the prejudice resulting from the district court's denial of their motion substantially outweighs any inconveniences to the court or the Government.

The district court found that allowing the Lords to withdraw their guilty pleas would waste "some" judicial resources. However, this court in *Carr* explained that the district court is in the best position to know the effect that withdrawal has on its resources. 740 F.2d at 345; *see also McKnight*, 570 F.3d at 650 (noting the same). We find no reason to dispute the district court's finding on this factor.

Based on the totality of circumstances, the evidence presented weighs against the withdrawal of the Lords' guilty pleas. We affirm the district court's judgment on this issue.

## B. Sentencing Calculations

### 1. Standard of Review

In considering the procedural reasonableness of a sentence, we review the district court's interpretation and application of the sentencing guidelines de novo and its findings of fact for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). Findings are not clearly erroneous if they are plausible based on the record as a whole. *United States v. Ochoa-Gomez*, 777 F.3d 278, 282 (5th Cir. 2015) (per curiam).

No. 17-30486

However, determinations regarding whether the defendant is entitled to a reduction for acceptance of responsibility are reviewed with particular deference. The court of appeals will affirm the denial of a reduction for acceptance of responsibility unless it is "without foundation, a standard of review more deferential than the clearly erroneous standard." *United States v. Juarez-Duarte*, 513 F.3d 204, 211 (5th Cir. 2008) (per curiam).

### 2. Relevant Facts

Between 2013 and November of 2014, the Lords deposited $2,656,491.37 into their MSB accounts for the exchange of bitcoin. While the Lords were being investigated, Michael was implicated in the shipment of a controlled substance from China to Alhasnat Laghari ("Laghari") in Springhill, Louisiana. After a controlled delivery to Laghari, Laghari stated he accepted the package for Michael. Further investigation revealed that Laghari was involved in online drug purchases and met Michael in the fall of 2014 to purchase bitcoin, which he used to buy drugs online.

According to Laghari, Michael told him that he wanted to create a Xanax manufacturing operation and become a vendor on the black market and Laghari agreed. They planned to manufacture hundreds and thousands of Xanax pills, stockpile them, sell them for bitcoin through an internet shop as quickly as possible, and split the profits. Michael bought a pill press and shipped it to Laghari. Michael and Laghari used a locked storage room in a tire shop Laghari's father owned to produce at least 10,000 Xanax tablets over a period of two to three weeks. In May 2015, Michael delivered between 8,000 and 10,000 Xanax tablets to an acquaintance of Laghari's for distribution.

### 3. Offense Levels

The probation officer assigned Michael and Randall each a base offense level of six for the bitcoin conspiracy. Sixteen levels were added under § 2S1.3(b)(1) and the table at § 2B1.1 based on the Lords' deposits of more than

No. 17-30486

$1,500,000 but less than $3,500,000. Two more levels were added under § 2S1.3(b)(1) because the Lords knowingly exchanged monetary proceeds from the distribution of a controlled substance, steroids, for bitcoin. Randall and Michael each had adjusted offense levels of 24 for the bitcoin conspiracy offense. Each defendant had a level I criminal history category.

On the drug count, Michael's base offense level of 24 for the Xanax tablets was based on a drug quantity between 100 and 400 kilograms of marijuana. Two levels were added under § 2D1.1(b)(12), based on Michael maintaining a premises for the purpose of manufacturing or distributing a controlled substance, for an adjusted offense level of 26. A multiple count adjustment was made to reach a combined adjusted offense level of 28. The Government objected, arguing, inter alia, that Michael's offense level should be enhanced another two levels under § 3B1.3 because he used a special skill to commit his drug offense.

### 4. Sentencing Hearing

Laghari testified for the Government at sentencing as follows. He met Michael after using a website called "localbitcoins" and purchased bitcoin from him. After he was arrested for drug activity, Laghari cooperated with law enforcement in recorded communications with Michael. Michael and Laghari communicated in "encrypted chats" on their laptop computers. The Government's exhibits reflected other special applications that Laghari and Michael communicated over other applications, that Michael had working knowledge of several sites on the "darknet marketplace," and that Michael and Laghari discussed which of those sites was the best place to advertise their manufactured Xanax. Laghari told the court that Michael's skill set included the "[t]ech work" with respect to the "darknet" and encryption and that Michael intended to train Laghari. Laghari described Michael as "a very intelligent computer skills set-type person."

12

No. 17-30486

Laghari also identified in a photograph the substances he and Michael used to manufacture Xanax and the pill press that Michael bought. Laghari explained that the drugs and the pill press were hidden in his father's business in Arkansas because Laghari and Michael needed a location for their operation. At one point, after Laghari began cooperating with law enforcement, Michael became concerned that they were under investigation in Arkansas and directed Laghari to move the pill press, unbeknownst to Randall, to Randall's office in Shreveport. Michael assured Laghari that his father would accept cash, would not make Laghari sign anything, and that Laghari could use the pill press undisturbed at night when the building was empty.

Laghari told the court that he used the pill press in Arkansas only twice, once with Michael and once while alone. Laghari nevertheless confirmed that he and Michael actually manufactured Xanax pills at Laghari's father's place of business in Arkansas.

### 5. *District Court Ruling*

The district court overruled the Lords' objection that the absence of an "actual loss" precluded the 16-level enhancement under §§ 2S1.3(b)(1) and 2B1.1. The district court declined to award either defendant a deduction for acceptance of responsibility. The court overruled Michael's objection to his § 2D1.1(b)(1) enhancement, finding that he and Laghari exercised a form of dominion and control over the premises where the pill press and the raw materials for the pills were stored. The court also sustained the Government's objection to the lack of a § 3B1.1 enhancement, agreeing that Michael used self-taught computer skills to commit his drug offense.

## C. Use of the Value of Exchanged Funds

### 1. *Applicable Law*

The guideline governing violations of 18 U.S.C. §§ 1960(a), (b)(1), and (b)(2) is U.S.S.G. § 2S1.3. This section provides that the base offense level is "6

13

No. 17-30486

plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the funds." U.S.S.G. § 2S1.3(a)(2). The Application Notes provide that "'value of the funds' means the amount of the funds involved in the structuring or reporting conduct," U.S.S.G. § 2S1.3, cmt n.1, because "[t]he relevant statutes require monetary reporting without regard to whether the funds were lawfully or unlawfully obtained." *Id.*

    *2. Analysis*

    The Lords argue that their base offense levels were incorrect because they did not cause the requisite "actual loss" for § 2B1.1 to apply. They point to § 2B1.1's commentary, which states that "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n.3(A)(i). They also point to its definition of "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," but which does not include "emotional distress, harm to reputation, or other non-economic harm." *Id.* at cmt. n.3(A)(iii). The Lords assert that none of their clients lost money, there is no evidence that the Lords intended for any money to be lost, stolen or defrauded, and their business, except for the FinCEN registration violation, was lawful. The Lords also suggest that the district court should have departed below the guidelines range of imprisonment that resulted from applying § 2S1.3.

    The district court's calculation represents a straightforward application of § 2S1.3(a)(2) and its commentary. *See United States v. Caro*, 454 F. App'x 817, 879 (11th Cir. 2012) (unpublished) ("Insofar as Caro alleged that his sentence was procedurally unreasonable due to the application of U.S.S.G. § 2S1.3 and the corresponding [§ 2B1.1] loss calculation, that guideline explicitly contemplated his offense of conviction, and the District Court calculated the loss according to its plain language."). Nowhere does § 2S1.3 suggest that there must be a "loss" associated with the structuring or reporting offense. The

14

No. 17-30486

district court duly noted that it is "not necessary under the guidelines for a specific person or business entity to lose money for the calculation to apply," as "the process itself and the failure to register properly are so-called societal-type crimes with harm resulting from transactions which are not adequately tracked and registered in accordance with law." The First Circuit has explicitly rejected the argument that an enhancement under § 2S1.3 is inappropriate if there was no "loss" in the crime. *See United States v. Beras*, 183 F.3d 22, 27 (1st Cir. 1999). Consequently, the enhancement was proper.

The district court also did not err in declining to depart below the guidelines range of imprisonment. The district court assured the Lords at sentencing that it was open to downward departures but indicated that in light of the evidence presented at the sentencing hearing, it was not inclined to do so. Because the district court knew it could depart downwardly but chose not to, this court lacks jurisdiction to review the Lords' argument that they were entitled to a downward departure. *See United States v. Fillmore*, 889 F.3d 249, 255 (5th Cir. 2018).

**D. Acceptance of Responsibility**

*1. Applicable Law*

A defendant who "clearly demonstrates acceptance of responsibility for his offense" receives a two-level reduction in his offense level. U.S.S.G. § 3E1.1(a). Such a defendant can receive an additional one-level reduction if his offense level prior to any acceptance-of-responsibility reduction is 16 or greater, and the United States so moves, representing "the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." *Id*. § 3E1.1(b).

15

No. 17-30486

"The defendant bears the burden of demonstrating that he is entitled to the [§ 3E1.1] reduction." *United States v. Flucas*, 99 F.3d 177, 180 (5th Cir. 1996).

A defendant who "falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n.1(A). Further, a defendant who pleads guilty, initially admitting the conduct underlying his guilty plea, but then later attempts to withdraw his plea, asserting innocence, does not demonstrate "sincere contrition" for purposes of § 3E1.1. *United States v. Espinoza*, 62 F. App'x 557, 557 (5th Cir. 2003) (per curiam) (unpublished); *see also United States v. Bastian*, 603 F.3d 460, 465 (8th Cir. 2010) ("A defendant's attempt to withdraw his guilty plea may be evidence that he did not accept responsibility for his offense.").

*2. Analysis*

The Lords argue that the district court erred when it denied them reductions for acceptance of responsibility. In denying the Lords any reduction for acceptance of responsibility, the district court cited Randall's erroneous contention that he never actually operated the exchange business and did not profit from it. The court also pointed to the Lords' objections to the determination that they exchanged $2.6 million for bitcoin; their objections to their base offense levels based on their assertion that there were no victims; and their attempt to withdraw their guilty pleas.

The record supports the district court's assessment that the Lords had not accepted responsibility for their bitcoin conspiracy offense. As such, the Lords fail to show that the district court's denial of a reduction for acceptance of responsibility was without foundation. *See United States v. Anderson*, 174 F.3d 515, 525 (5th Cir. 1999).

No. 17-30486

## E. Maintaining a Premises for the Purpose of Manufacturing or Distributing Controlled Substances

### 1. Applicable Law

Section 2D1.1(b)(12) of the guidelines provides a two-level enhancement if the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." According to the commentary, "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." U.S.S.G. § 2D1.1, cmt. n.17. In making our determination, we consider whether the defendant held a possessory interest in the property and "the extent to which [he] controlled access to, or activities at, the premises." *Id.*

### 2. Analysis

Michael argues that the district court erred by enhancing his sentence under § 2D1.1(b)(12) because he lacked an ownership interest in Laghari's father's tire shop, he had no access to the shop or control over the activities, and was only on the premises one time.

The Government relies on the following undisputed evidence to support the enhancement: (1) Michael and Laghari acquired a pill press and the raw materials needed to manufacture Xanax pills; (2) they stored the pill press and the materials in a locked storage room in Laghari's father's business in Arkansas; and (3) they met on one occasion in that room, spent ten to twelve hours calibrating the pill press, and produced a batch of "dummy" pills to test the machine. The Government adds that in furtherance of their agreement to produce pills for sale, Laghari used that room to produce 10,000 pills containing Alprazolam, a controlled substance. Finally, the Government maintains that when Michael grew concerned that law enforcement was

17

No. 17-30486

investigating them, he directed Laghari to move the pill press to a new location—his father's business.

While it is true Michael neither personally owned nor rented the building or room where the pill press was stored and the pills were produced, formal ownership is not dispositive. *See United States v. Guzman-Reyes*, 853 F.3d 260, 265 (5th Cir. 2017) ("Although Guzman's name may not have been on a formal lease agreement or ownership documents . . . it would defy reason for a drug dealer to be able to evade application of the enhancement by the simple expedient of maintaining his stash house under someone else's name." (quotation omitted)); *United States v. Rodney*, 532 F. App'x 465, 472–73 (5th Cir. 2013) (per curiam) (unpublished) (upholding application of the enhancement where the defendant neither rented nor owned the shed that stored his drugs).

In *Guzman-Reyes*, the defendant gave the shop owner about one ounce of methamphetamine per month, a value of approximately $1,000, in exchange for storage of his drugs at the shop. 853 F.3d at 263. Guzman-Reyes did not have keys to the shop, but contacted his co-conspirator whenever he needed access. *Id*. This court upheld the application of the enhancement, relying on Guzman-Reyes' "unrestricted access to the premises" through his co-conspirator. *Id*. at 264–65. Most of the cases that *Guzman-Reyes* cites concern defendants who occupied or paid the rent for premises, *United States v. Roberts*, 913 F.2d 211, 221 (5th Cir. 1990), coordinated the acquisition and financial management of the property, *United States v. Carter*, 834 F.3d 259, 263 (3d Cir. 2016), or were at least frequently present at a relative's place and had coordinated drug activities there over a considerable period of time, *United States v. Morgan*, 117 F.3d 849, 855–57 (5th Cir. 1997).

In this case, it is undisputed that Michael and Laghari were to split the profits of whatever drugs were sold after manufacturing was complete at the

18

No. 17-30486

tire shop. However, we do not have any evidence that Michael could have gained or did gain "unrestricted access to the premises" through Laghari. *Guzman-Reyes*, 853 F.3d at 265. The storage room here was explicitly owned by Laghari's father. Though Laghari had his own key and could open and use the room without his father's permission, Michael did not. There is no indication that Michael was able to access the storage room without Laghari's express permission and physical assistance unlocking the door. In fact, Michael went there only once, when Laghari permitted him access and worked in there with him.

In *Rodney*, this court reasoned that the defendant had "unimpeded access to the shed and used it as he wished." 532 F. App'x at 473. Again, there is no evidence that Michael exercised control over the "access to, or activities at, the premises." U.S.S.G. § 2D1.1, cmt. n.17. Michael's control appears to be demonstrated more so through his possessory interest in the pill press than the premises itself. Consequently, the enhancement is improper.

## F. Use of a Special Skill

### 1. Applicable Law

Section 3B1.3 of the guidelines provides a two-level enhancement if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. According to the commentary, a "special skill" is one "not possessed by members of the general public and usually requiring substantial education, training, or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."[2] *Id.* § 3B1.3, cmt. n.4.

---

[2] The sentencing guidelines do not provide any advisory or explanatory information beyond this commentary.

19

No. 17-30486

*2. Analysis*

Michael argues that the district court erred when it enhanced his sentence under § 3B1.3 because he had no formal education, training, or licensing in regard to his computer skills, and there was no evidence as to any self-taught education. He asserts that people his age (31) possess extensive computer skills. Michael maintains that the ability to download a "special software" and install it on one's computer to access the "dark web" can be completed with "a simple Google search and requires average computer competency."

In applying § 3B1.3, the district court relied on an Eleventh Circuit case upholding the enhancement where, in furtherance of a drug conspiracy, the defendant used his self-taught skills as an advanced-level radio operator to contact the source of cocaine in Colombia. *See United States v. Malgoza*, 2 F.3d 1107, 1108–09, 1111–12 (11th Cir. 1993). The PSR in that case indicated that the defendant had used a radio to Colombia so many times that he had become an expert. *Id.* at 1109.

While this circuit has applied the enhancement to skills obtained outside of college-level or other formal education, these cases do not provide analogous facts. Two of the most relevant cases both concerned defendants who obtained specialized credentials requiring at least an informal course of study. *See, e.g., United States v. Villafranca,* 844 F.3d 199, 199–200 (5th Cir. 2016) (per curiam), *cert. denied*, 137 S. Ct. 1393 (2017) (finding "the ability to drive a tractor trailer truck as evidenced by the possession of a commercial driver's license constitutes a special skill for purposes of § 3B1.3"); *United States v. Rorex*, 16 F.3d 1214, 1214 (5th Cir. 1994) (per curiam) (unpublished) (affirming application of the enhancement to a defendant who never finished high school and learned tax preparation skills in a three month program at H & R Block). The record does not indicate Michael ever engaged in any course of study with

No. 17-30486

regard to computers, nor was he certified in this pursuit. This suggests the enhancement does not apply, and case law out of our sister circuits that have dealt with similar computer skills issues confirms this result.

In *United States v. Green*, 962 F.2d 938 (9th Cir. 1992), the Ninth Circuit reversed a special skills enhancement. Green took graphic design classes, learned from an instructor about paper that could be used for currency and about how it could be properly cut, ordered the special paper, and took numerous photographs of currency in the course of his counterfeiting scheme. *Id.* at 940. The Ninth Circuit held that the printing and photographic skills were not so "special" as to permit the district court to impose the enhancement, stating it's not enough that "the offense was difficult to commit." *Id.* at 944.

The Ninth Circuit in *United States v. Petersen*, 98 F.3d 502 (9th Cir. 1996) distinguished *Green* and applied the enhancement to an expert hacker, providing helpful guidance on the application of the enhancement to computer skills. Petersen hacked into a national credit reporting agency's computer system and stole personal information that he used to order fraudulent credit cards. *Id.* at 504. Then he hacked into a telephone company's computers, seized control of the telephone lines to a radio station, and arranged for himself and his confederates to be the callers who "won" two Porsches, $40,000, and two trips to Hawaii in a radio call-in contest. *Id.* Then he hacked into a national commercial lender's computer and had it wire $150,000 to him through two other banks. *Id.* at 505. "This goes far beyond the computer skills of a clever high school youth or even many people who earn their livings as computer technicians and software engineers." *United States v. Lee*, 296 F.3d 792, 796 (9th Cir. 2002) (holding that developing a basic website does not require "special skills" as established in *Petersen*).

 The district court found that Petersen had "extraordinary knowledge of how computers work and how information is stored, how information is

21

No. 17-30486

retrieved, and how the security of those systems can be preserved or invaded," and imposed the special skills enhancement. *Petersen*, 98 F.3d at 506. The Ninth Circuit affirmed, holding that "[d]espite Petersen's lack of formal training or licensing, his sophisticated computer skills reasonably can be equated to the skills possessed by pilots, lawyers, chemists, and demolition experts" for purposes of the special skills enhancement. *Id*. at 507. In a footnote, the Ninth Circuit went out of its way to caution against routine application of the special skills enhancement to people with computer skills:

> We do not intend to suggest that the ability to use or access computers would support a "special skill" adjustment under all circumstances. Computer skills cover a wide spectrum of ability. Only where a defendant's computer skills are particularly sophisticated do they correspond to the Sentencing Commission's examples of "special skills"—lawyer, doctor, pilot, etc. Courts should be particularly cautious in imposing special skills adjustments where substantial education, training, or licensing is not involved.

*Id*. at 507 n.5; *see also Lee*, 296 F.3d at 798 ("[T]his adjustment becomes open-ended to the point of meaninglessness if the phrase 'special skill' is taken out of its context.").

In *United States v. Godman*, 223 F.3d 320 (6th Cir. 2000), the Sixth Circuit considered *Petersen* and quoted and followed the limiting footnote. *Id*. at 322–23. Like Green, Godman was a counterfeiter, but Godman used an off-the-shelf professional page publishing program, Adobe PageMaker, with a scanner and a color inkjet printer. *Id*. at 322. He had learned PageMaker in a week, and had specialized computer experience preparing and repeatedly updating a color catalog. *Id. Godman* held that the special skills enhancement could not properly be imposed because Godman's level of computer skills was not analogous to the level of skill possessed by lawyers, doctors, pilots, and other specialized professionals. *Id*. at 323. The Sixth Circuit held that the district court erred by stressing "overmuch" that Godman's skills were not

22

No. 17-30486

shared by the general public: "As the Application Note's reference to the substantial training of such professionals as doctors and accountants suggests, emphasis is better placed on the difficulty with which a particular skill is acquired." *Id.* at 322. The Sixth Circuit emphasized that "[s]uch skills are acquired through months (or years) of training, or the equivalent in self-tutelage." *Id.* at 323. A defendant's self-taught skills must be "particularly sophisticated." *Id.*

The Sixth Circuit later expanded on the self-taught skills discussed in *Godman* and applied the special skills enhancement to a defendant's sentence for trafficking circumvention technology. *See United States v. Reichert*, 747 F.3d 445 (6th Cir. 2014). Although Reichert argued that he was a truck driver with only a high school diploma, building on skills learned in a high school vocational program that taught him how to build his own computer systems from components, he continued to modify consoles for almost half of a decade. *Id.* at 455. Reichert was lauded within the gaming community as one of a very few individuals who knew the work-around for one of the most complicated modifications. *Id.* His expert assistance was actively sought out and paid for by gamers who had attempted to modify consoles but were unable to do so or who were trying to prevent manufacturers from detecting that consoles had been modified. *Id.*

As set forth above, Laghari's testimony established that Michael was adept at using the darknet in connection with selling illicit drugs and that he personally believed that Michael was skilled at using computers. Michael's PSR reflects, however, that he withdrew from high school in the tenth grade and obtained his Graduate Equivalency Diploma in 2008. Further, his employment history included only the bitcoin exchange business at issue here and working as a movie extra from 2008 to 2010. Michael did not have a college-level or higher education, did not possess a license or certificate

No. 17-30486

pertaining to computers, and had never worked in a field that even tangentially related to computers. Accordingly, Michael's background does not demonstrate any education, training or licensing in the skills at issue. *See United States v. Gill*, 642 F. App'x 323, 326 (5th Cir. 2016) (finding defendant's commercial driver's license provided him a special skill for transporting undocumented aliens); *United States v. Stalnaker*, 571 F.3d 428, 441 (5th Cir. 2009) (holding defendant attorney performing mortgage closing possessed special skill warranting enhancement for convictions arising out of mortgage fraud); *United States v. Olis*, 429 F.3d 540, 549 (5th Cir. 2005) (affirming defendant accountant's enhancement for use of his special skills in accounting and tax matters to advance "extremely sophisticated, but fraudulent, scheme").

Neither Michael's skills nor their results come close to the "expert hacker" in *Peterson* or the technology trafficker in *Reichert*. Petersen and Reichert had acquired extraordinary knowledge that allowed them to circumvent sophisticated systems. Michael's self-taught skills were more like Green's or Godman's, and not in the class of "pilots, lawyers, doctors, accountants, chemists, and demolition experts."[3] Thus, the district court's imposition of the special skills enhancement was not supported by the findings. We reverse and remand for resentencing solely on this issue.

### III.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment as to Michael Lord and Randall Lord, with the exception that we REVERSE and REMAND for resentencing as to Michael Lord's maintaining a premises for the

---

[3] We stress that our holding here is limited to the specific facts and circumstances of this case and should in no way be interpreted to routinely apply to every case in which internet searches are used to aid in the perpetration of a crime.

No. 17-30486

purpose of manufacturing or distributing a controlled substance enhancement and special skills enhancement.